**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2413-19

STATE OF NEW JERSEY,
by the DEPARTMENT OF
ENVIRONMENTAL
PROTECTION,

     Plaintiff-Respondent,

v.

BAY HEAD IMPROVEMENT
ASSOCIATION,

     Defendant-Appellant.

_____

Argued June 21, 2021 – Decided July 12, 2021

Before Judges Fisher and Fasciale.

On appeal from the Superior Court of New Jersey, Law Division, Ocean County, Docket No. L-2904-17.

Peter H. Wegener argued the cause for appellant (Bathgate, Wegener & Wolf, PC, attorneys; Peter H. Wegener, of counsel and on the briefs; Daniel J. Carbone, on the briefs).

Jason M. Hyndman argued the cause for respondent (Decotiis, Fitzpatrick, Cole & Giblin, LLP, attorneys;

George G. Frino, of counsel; Jason M. Hyndman, on the brief).

PER CURIAM

As part of the Manasquan Inlet to Barnegat Inlet storm damage reduction project (the project), the State of New Jersey, Department of Environmental Protection (plaintiff or DEP) took an easement over beachfront property owned by Bay Head Improvement Association (defendant or BHIA). The court-appointed commissioners valued the property and fixed just compensation at more than $2 million. A jury determined defendant was entitled to zero compensation for the taking, finding the property plaintiff offered as a substitute was similar to what plaintiff had taken and enhanced the value of defendant's remainder property, because it was larger and had greater storm protection. Defendant was unsuccessful on its motions for judgment notwithstanding the verdict (JNOV) and a new trial.

On appeal, defendant argues that the judge improperly permitted the jury to consider whether defendant mitigated its damages, the evidence did not comply with the requirements of State, by Comm'r of Transp. v. Weiswasser, 149 N.J. 320, 330 (1997), and the evidence did not support the verdict.

We are unpersuaded by these contentions and affirm.

2

I.

We reject defendant's argument that the judge erred by permitting the jury to consider the doctrine of mitigation of damages because—as defendant points out—it was not seeking severance damages. We conclude that even though defendant did not explicitly seek severance damages, the judge correctly instructed the jury to consider mitigation because the evidence supported a finding that the condemnation was a partial taking and the remnant retained some value.

The judge instructed the jury that defendant was entitled to just compensation—the difference between the fair market value (FMV) of defendant's property before and after the taking. Additionally, the judge instructed:

> [I]n determining the [FMV] of the taking[,] you must consider the property owner's duty to mitigate damages resulting from the taking by applying a cost to cure analysis to the computation of damages. Under this analysis you must consider evidence of availability and use of similar replacement property when under all of the surrounding circumstances such property would reasonably affect the [FMV] of the property. . . . Accordingly, both parties' appraisers have concluded that the highest and best use for these properties is for beach recreation.
>
> What is critical in a cost to cure evaluation is not whether a property owner may be compelled to acquire

3

a substitute property[,] but whether under all of the surrounding circumstances reasonable and willing parties would consider . . . the availability and use of such property as bearing on the market value of the owner's remaining property. . . . The threshold issue in the analysis of cost to cure mitigation is the comparability of the replacement property. That is the extent to which the replacement property is sufficiently similar to the property taken. The similarity of such property bears on whether it may be considered useful and available in conjunction with the remainder property. The similarity of the property in this context requires the jury to evaluate not only the location and the physical characteristics of the property as the proposed substitute property but you as jurors . . . also evaluate the ownership interest and the quality of the title to the property being offered as a substitute property as that property taken from [defendant]. The basic issue that you must evaluate is whether it is reasonable and fair to consider the proposed property as an adequate substitute for the property taken. The cost to cure measure of damages is . . . applicable only when the replacement property would totally cure the damage caused by the condemnation to that portion of the land not condemned. The evidence must show that [defendant] will be as well off with the replacement land as it was with the land it lost prior to the actual taking. The issue of similarity of replacement property is primarily factual. The degree of similarity is relevant to the issue of whether under all of the circumstances [it is fair] for [defendant] to accept the nature and the quality of the property being offered as substitute property it lost through the imposition of the [S]tate's easement.

In the event the jury determines that the property proposed as substitute by [plaintiff] is similar to the property lost by [defendant,] the jury must then go on

4

to consider under all of the surrounding circumstances whether the substitute property would reasonably affect the [FMV] of the remainder of property.

In deciding defendant's motion for a new trial, the judge acknowledged that defendant had not sought severance damages, but instead, had requested a finding that the property was a worthless economic remnant. The judge noted that defendant's expert considered the property after the taking to be worth $350,000, and, therefore, not worthless. The judge also expressed that the substitute land offered to defendant was beachfront property that had been created by the project's distribution of "hundreds of thousands of tons of sand" that had "redefined the shore-line" and shifted the water's edge in an easterly direction.

Fair compensation for the value of property taken pursuant to condemnation is the difference between the value of the parcel before the taking and the value of the remainder after the taking. State, by Comm'r of Transp. v. William G. Rohrer, Inc., 80 N.J. 462, 464 (1979). Where a partial taking has drained the property of all economic worth, the result is the creation of an "uneconomic remnant." Id. at 464-65. "If as a result of a partial taking of property, the property remaining consists of a parcel or parcels of land having

little or no economic value, the condemnor, in its own discretion or at the request of the condemnee, shall acquire the entire parcel." N.J.S.A. 20:3-37.

> When the State takes private property for a public purpose under the provisions of the Eminent Domain Act of 1971, the property owner is entitled to just compensation. Where the whole of a property is taken, the measure of damages is the [FMV] of the property as of the date of the taking, determined by what a willing buyer and a willing seller would agree to, neither being under any compulsion to act.
>
> . . . .
>
> [W]here only a portion of a property is condemned, the measure of damages includes both the value of the portion of land actually taken and the value by which the remaining land has been diminished as a consequence of the partial taking. The diminished value of the remaining property constitutes the severance damages visited upon that property as a result of the taking.
>
> [State, by Comm'r of Transp. v. Silver, 92 N.J. 507, 513-14 (1983) (citations omitted).]

New Jersey courts have used two methods to compute severance damages. Id. at 514. One method is to take the market value of the land taken, plus the difference in FMV before and after the taking of the remainder area. Ibid. The other method is to take the difference between the FMV of the entire tract before the taking and the value of the remainder area after the taking. Ibid.

6

FMV is the value assigned "by knowledgeable parties freely negotiating . . . under normal market conditions based on all surrounding circumstances at the time of the taking." Ibid. A determination of FMV requires a finding as to the "highest and best use of the property." State, by Comm'r of Transp. v. Hope Rd. Assocs., 266 N.J. Super. 633, 641 (App. Div. 1993). "Highest and best" use is "[t]he reasonably probable and legal use of . . . an improved property, which is physically possible, appropriately supported, financially feasible, and that results in the highest value." Id. at 641-42 (alterations in original) (citing Chevron U.S.A., Inc. v. City of Perth Amboy, 10 N.J. Tax, 114, 145 (1988)).

In Weiswasser, the Court held that a condemnee seeking severance damages in a partial condemnation case has a duty to mitigate damages resulting from the taking by applying a "cost to cure" analysis to the computation of damages in a partial taking. Weiwasser, 149 N.J. at 330 (citing 4A Nichols on Eminent Domain § 14A.04 (3d ed. rev. 1997)). To determine just compensation and whether a condemnee has properly mitigated damages in a partial taking condemnation case, evidence may be admitted regarding the "availability and use of similar replacement property, when, under all of the surrounding circumstances, such property would reasonably affect the [FMV] of the remainder property." Id. at 337-39. The Weiswasser Court considered other

jurisdictions' determinations regarding requiring a condemnee to accept substitute property instead of monetary compensation. Id. at 331-34, 343.

> Nevertheless, [the FMV analysis] is not one which is mandated in every condemnation matter. Where the property involved has a single special use by virtue of controlling ordinances or covenants, it is within the power and discretion of the factfinder to utilize other approaches which may be more realistically applicable to the unusual circumstances.
>
> So long as the determination is rational, is supported by the evidence, and constitutes the "just compensation" mandated by the New Jersey Constitution, the means of arriving at such determination may be varied and flexible, dependent upon the character and use of the property involved.
>
> [Middlesex Cnty. v. Clearwater Vill., Inc., 163 N.J. Super. 166, 173 (App. Div. 1978) (citation omitted).]

In Jersey City Redevelopment Agency v. Kugler, 58 N.J. 374, 383-84, (1971) (citing United States v. Cors, 337 U.S. 325, 332 (1949)), the New Jersey Supreme Court stated:

> There is no precise and inflexible rule for the assessment of just compensation. The Constitution does not contain any fixed standard of fairness by which it must be measured. Courts have been careful not to reduce the concept to a formula. The effort has been to find working rules and practical standards that will accomplish substantial justice such as, but not limited to, market value.

Construction of a dune for purposes of shore protection is, by definition, a benefit to oceanfront property owners.  Borough of Harvey Cedars v. Karan, 214 N.J. 384, 414 (2013).

A different method of compensation is used when the condemnation involves a taking of public lands.  State, by Comm'r of Transp. v. S. Hackensack Twp., 65 N.J. 377, 383-84 (1974).  In such circumstances, the property may be valued under the substitute facilities doctrine.  Ibid.  This method is based upon the "inadequacy and incongruity of a monetary award as compensation for" the condemnation of public property.  Id. at 383.  In such cases, "just compensation should take, not the form of market value, but rather the cost of replacing the facility with a substitute or replacement."  Id. at 383-84.

The condemnor must furnish "an adequate, substantially equivalent substitute facility" but it does not need to be "an exact duplicate of what has been taken."  Id. at 385.  To apply the substitute facilities doctrine, the condemnee must be a municipality or some other agency of government.  Ibid.

In Matthews v. Bay Head Improv. Assoc., 95 N.J. 306 330 (1984), the New Jersey Supreme Court found as follows with respect to defendant:

> The Association's activities paralleled those of a
> municipality in its operation of the beachfront.  The size
> of the beach was so great that it stationed lifeguards at
> five separate locations.  The beach serviced about 5,000

9

members. The lifeguards performed the functions characteristic of those on a public beach. They posted warnings with respect to the safety of swimming. They stood ready to render assistance to anyone in need of aid. These guards were available daily throughout the summer months. The beach was maintained and kept clean by crews who worked each day. These crews cleaned the beach from end to end, including properties not leased to the Association. Membership badges were sold and guards were stationed at entrances to the beach to make certain that only those licensed could gain admittance. Further, some guards patrolled the beach to make certain that members and guests complied with the Association's rules and regulations. When viewed in its totality—its purposes, relationship with the municipality, communal characteristic, activities, and virtual monopoly over the Bay Head beachfront—the quasi-public nature of the Association is apparent.

Defendant argues that even though the judge acknowledged defendant had not requested severance damages, it nonetheless believed it was constrained by Weiswasser to permit the jury to consider mitigation of damages. This was incorrect, according to defendant, because the taking was total, thereby rendering the remainder an uneconomic remnant. In fact, the remainder land where the dune was constructed was merely a walkover to the beach that could not be used or occupied. Because it maintained that the taking was total and not partial, defendant never requested severance damages, and therefore, defendant contends the judge should not have permitted the jury to consider whether its damages were mitigated.

10

Plaintiff responds that defendant's argument rests on "simultaneously accepting the contradictory positions" that on the one hand, the 2.93 acres encumbered by the easement and the 2.37 acres of unencumbered land lost all economic value, and, on the other hand, that there was no severance damage to the remainder. Plaintiff also asserts that even if defendant did not explicitly request severance damages, it did, in fact, pursue those damages. This is because the easement encumbered only 2.93 acres of the 5.30 acres of land, but defendant's own appraiser valued the entirety of the properties and reduced the value of the property from $20 to $2 per square foot, including the 2.37 acres of unencumbered land. This, according to plaintiff, essentially established defendant's claim for severance damages.

We disagree with defendant's characterization of the remainder property as an uneconomic remnant. As the judge noted, Graziano valued the property after the taking as having an FMV of $350,000. Graziano considered the price per square foot after the taking to have been reduced from $20 per square foot to $2. Although this represents a significant decrease, based on defendant's own calculations, we nevertheless do not agree that the remainder property had no economic value.

11

Because the remainder was not an uneconomic remnant, the taking was partial and not total. Thus, despite the fact that defendant did not formally request severance damages, the judge correctly instructed the jury to consider mitigation. Weiswasser stands for the proposition that where there is a remainder property that retains value, the defendant must mitigate damages. 149 N.J. at 337-39. Weiswasser does not require a defendant to request severance damages in order for mitigation to apply.

When determining whether jury instructions were erroneous, the question is whether the charge was clearly capable of producing an unjust result. Prioleau v. Ky. Fried Chicken, Inc., 223 N.J. 245, 257 (2015). Instructions given in accordance with the model charge, or which closely track the model charge, are generally not considered erroneous. Mogull v. CB Commercial Real Est. Grp., Inc., 162 N.J. 449, 466 (2000). Here, the judge instructed the jury on whether the substitute property would affect the FMV of the remaining property. Moreover, the judge's instruction closely tracked Model Jury Charges (Civil), "Condemnation—Partial Taking (Severance Damages)" (approved Apr. 1996). Therefore, even if the judge did not explicitly use the term severance damages in his instructions, and even if defendant did not specifically request those

damages, the judge clearly instructed the jury about them. We do not believe the charge as a whole was capable of producing an unjust result.

Defendant argues that the judge erred by allowing plaintiff to present a substitute facilities theory under the guise of mitigating damages. We disagree. The analysis of mitigation in Weiswasser requires consideration as to whether substitute property offered by the condemnor is similar and adequate to cure the loss caused by the condemnation. Weiswasser, 149 N.J. at 337-39. Thus, to properly analyze whether damages were mitigated requires an analysis of the substitute property offered. However, as noted, the substitute facilities doctrine espoused in Hackensack is only available for the condemnation of public lands. 65 N.J. at 383-85.

Here, the judge was very clear that the substitute facilities theory was not applicable because defendant was not a public entity, but instead a private non-profit corporation. We do not agree with defendant that the judge permitted plaintiff to present a substitute facilities argument under the guise of mitigating damages. The judge's instructions were clearly in conformance with the mitigation theory of Weiswasser and not with the substitute facilities theory of Hackensack.

II.

"Determining the [FMV] of a parcel is not a science, but rather it involves an estimation based on a number of variables." Borough of Merchantville v. Malik & Son, LLC, 429 N.J. Super. 416, 433 (App. Div. 2013) (quoting City of Asbury Park v. Asbury Park Towers, 388 N.J. Super. 1, 9 (App. Div. 2006)). "Where . . . no part of the land is taken in fee, but only a limited interest in the land, the measure of the owner's damages is the difference in the [FMV] of the property before and after the taking." Tenn. Gas Transmission Co. v. Maze, 45 N.J. Super. 496, 501-02 (App. Div. 1957). "To segregate the owner's loss by way of the diminution of the value of the fee in the easement strip itself . . . would ordinarily be impracticable[.]" Id. at 502.

"[C]ost to cure and replacement cost are not of themselves precise mathematical measures of damages, but they are useful evidence and tools in arriving at a proper award." Weiswasser, 149 N.J. at 334 (citation omitted). The similarity of replacement property "bears on whether it may be considered useful and available in conjunction with the remainder property. The basic issue is whether it is reasonable and fair to consider that property as a substitute for the property taken." Id. at 336.

> The issue of the similarity of replacement property is primarily factual. The degree of similarity is relevant

14

to the issue of whether under all of the circumstances it would be reasonable for the condemnee to accept property that is available and contiguous to the remainder property as a suitable substitute or replacement for the property taken when that will reduce or eliminate the damages to the remainder property. It is an issue that can be presented readily through testimony and evidence, including the opinions of experts, and determined by the fact-finder.

Accordingly, we now hold that a condemnee seeking severance damages in a partial-taking condemnation action has a duty to mitigate those damages. The court may consider evidence of the availability and use of similar replacement property, when, under all of the surrounding circumstances, such property would reasonably affect the [FMV] of the remainder property. Such evidence may be used in mitigation of damages in determining just compensation in a partial-taking condemnation case.

[Id. at 337.]

Defendant distinguishes Weiswasser because, there, the State offered substitute property with a fee simple interest. Here, the substitute property offered by the State was not in fee simple. In essence, defendant argues that plaintiff's proposed riparian easement did not under "all of the surrounding circumstances" reasonably affect or enhance the market value of the remainder property. This is because prior to the taking, defendant owned the property in fee simple and now owns it subject to the storm damage reaction easement (SDRE).

15

But Weiswasser does not require that ownership rights in the condemned property and the substitute property be equivalent. Ibid. Rather, the Court requires consideration of "the availability and use of similar replacement property, when, under all of the surrounding circumstances, such property would reasonably affect the [FMV] of the remainder property." Ibid. The FMV of the remainder property is not exclusively a matter of ownership interest.

In fact, it was the province of the factfinder to determine whether the property offered by plaintiff was an adequate substitute to cure the loss from the condemnation. The jury heard Graziano's testimony that the ownership interests had changed, and the riparian easement and tidelands license were worthless. The jury also heard Graziano's hypothetical analogy of "[y]ou can live in my house, [and] give me your house." The jury considered all the circumstances and found that the substitute property was reasonable. This factual finding is supported by evidence in the record.

Defendant argues that, at a pretrial hearing, plaintiff stated it would set forth through its expert testimony evidence that there was still a market for the underlying fee. According to defendant, Brodowski did not introduce evidence of the market value for the underlying fee. In fact, defendant argues, the

16

underlying fee can no longer be transferred, and its property now has virtually no marketable value.

It is true that at the pretrial hearing plaintiff stated it would set forth evidence of the market value for the underlying fee. Brodowski provided evidence of the value of the entire tract before and after the taking. Nevertheless, she acknowledged the scarcity of evidence for this type of appraisal because most vacant beach land is owned by a municipality, and because there are few comparable sales for properties before and after placement of a dune. In any case, both experts provided evidence of the value of the property, and this was sufficient to comply with the requirement in Weiswasser to determine "the availability and use of similar replacement property, when, under all of the surrounding circumstances, such property would reasonably affect the [FMV] of the remainder property." 149 N.J. at 337.

According to defendant, continued operation of the beach does not mitigate its losses and is not relevant to a determination as to the value of the remaining property. Instead, defendant argues that plaintiff should be required to pay just compensation for the property taken, or the difference between the before and after value as determined by the jury as $1,961,700.

A-2413-19

Defendant is a non-profit which operates the local beaches. Defendant has never sold any of its property, but instead is dedicated to providing public access to the beach for the benefit of the Bay Head community. The jury's finding that defendant's damages were mitigated was based on competent evidence in the record.

Defendant notes in a footnote that the judge did not address the issues raised in the motion for the new trial, but, instead, deferred to the Appellate Division for guidance. Rule 2:6-2(a)(5) does not permit arguments to be raised in the footnote of a brief. Almog v. Israel Travel Advisory Serv., Inc., 298 N.J. Super. 145, 155 (App. Div. 1997). Nevertheless, because the judge requested guidance from this court, we will provide some brief remarks.

During oral argument on the motion for a new trial, the judge raised a concern that defendant was receiving substitute property with inferior ownership quality (because it was less than a fee simple, as a result of the easement) and with less control (because defendant was not permitted to use the area where the dune was constructed). The judge also expressed concern as to whether the jury should determine whether substitute facilities are adequate when there is a change in the title and quality of ownership, or whether that should be determined by the judge, as a matter of law.

The judge noted that in other beach litigation currently before New Jersey courts, the parcels contain residences, and the jury must determine if the benefit from the beach improvement project offsets the loss to the property owners. But here, the property had no residence and instead was entirely beach front and used for public recreation. Thus, the judge requested guidance from this court as to whether an alteration in the title should prevent the jury from evaluating whether the substitute property is substantially similar. The judge suggested that if a similar matter arose in the future, a trial judge could make a preliminary determination as to whether the quality of the title is similar, and the jury could thereafter determine whether the usage and functioning of the property provides an adequate remedy.

However, in State v. 1 Howe St. Bay Head, 463 N.J. Super. 312, 345 (App. Div. 2020), we addressed a similar easement, and the court determined that "it was reasonable for the appraisers to conclude the properties would be more valuable after the condemnation because the Project overall would enhance shore protection for the entire area." The quality of ownership of the parcel was not the main consideration, but rather the judge considered the benefit to the shore as a whole. Also, State v. N. Beach 1003, LLC, 451 N.J. Super. 214, 233-39 (App. Div. 2017), stands for the notion that DEP, for purposes of shore

protection, may take a perpetual easement and is not required to take a fee simple. Even though the perpetual easement in that case, similar to the SDRE here, impacted the fee simple ownership of the condemned land, this court approved of the appraiser's valuation of the condemned property. Id. at 245. We did not require the factfinder to make a separate determination as to how the change in ownership affected the value of the condemned land. Ibid.

It is a factual determination for the jury whether the substitute property is adequate, and part of that determination might be the change in ownership. The key issue is not whether there is a residence benefiting from the shore protection, because, in fact, the whole shore benefits from the project. Ibid. In our view, it would be reasonable for the trial judge to explain to a jury the meaning of terms used for describing ownership such as "easement" and "fee simple." However, our case law establishes that the ultimate factual determination as to whether the substitute property mitigates damages is a fact question for the jury.

III.

Next, defendant argues the judge erred by permitting the jury to consider whether the substitute property interests offered by plaintiff mitigated its damages.

20

In ruling on a pretrial application, the judge agreed that defendant was not a public entity, and therefore, the substitute facilities theory espoused in Hackensack did not apply. The judge determined that defendant was a private non-profit corporation, notwithstanding the Supreme Court's findings in Matthews.

As noted, the judge instructed the jury to determine whether the property interest offered by plaintiff was an adequate substitute for the property taken, and whether the replacement property would "totally cure the damage caused by the condemnation."

At oral argument on the motion for a new trial, the judge noted that had he been the finder of fact, it might have found differently than the jury because the level of ownership in the property changed as a result of the SDRE. Nevertheless, the judge concluded that the adequacy of the substitute property was a factual determination for the jury, and here, the jury verdict was supported by the evidence.

In deciding the motion for a new trial, the judge stated:

> Substitute property is not to be evaluated in terms of worthiness for an in-kind exchange for the land which was taken through condemnation. The availability of substitute property is strictly a "cost to cure" analysis.
>
>      . . . .

21

Comparability of substitute land requires the fact finder to undertake an evaluation of the before and after utility of the property in the condition once the substitute property has been acquired by the condemnee. Because the alternate property is a substitute by definition, it is not the same. No two properties will ever be the same, however, the fair and reasonable consideration of a substitute requires a broader evaluation. Does the substitute property remedy the damage suffered by the remainder from the taking? Does the substitute property permit the remainder to function in its highest and best use as it would have prior to the taking? The perception that no two parcels of real property are alike does not call for the reflexive and rigid rule that evidence of replacement property must be equated with the forced acquisition of the property.

The parties did not appeal the judge's determination that the substitute facilities doctrine did not apply. Nevertheless, defendant argues that notwithstanding the judge's determination, he applied the doctrine of substitute facilities as enunciated in Hackensack. For example, defendant argues that on the one hand, the judge stated he was constrained by Weiswasser, but then "reversed" himself and conflated the doctrine of mitigation with the doctrine of substitute facilities. Defendant surmises that perhaps the judge was trying to create a hybrid by characterizing defendant as a quasi-public trust.

We do not agree that the judge created a hybrid valuation method or confused the doctrines of mitigation and substitute facilities. The judge was

22

clear that <u>Hackensack</u> did not apply because the property did not encompass public lands, and the judge never revisited that determination. Nevertheless, as noted, in <u>Weiswasser,</u> a consideration of substitute property was a necessary part of the analysis as to whether a defendant's damages were mitigated. Thus, the judge was correct to instruct the jury to consider substitute property in the context of mitigation of damages.

<u>Weiswasser</u> and <u>Hackensack</u> utilize the term "substitute" for the land offered by the condemnor. But in <u>Hackensack</u>, as noted, the analysis only pertains to public lands. Here, the judge did not consider defendant's property to be public lands, although there was support in the record for such a finding, given defendant's devotion to promoting the public welfare in Bay Head. Further confusing the issue, at a point, the judge referred to defendant as a "quasi-public entity," a term that was used in <u>Matthews</u> to describe defendant. The judge's point was that before the taking, defendant's sole purpose was to promote the public welfare through the operation of the beach in Bay Head, and after the taking this was still defendant's purpose. But the judge's statement is not tantamount to a finding that because defendant was a public entity, the substitute facilities doctrine espoused in <u>Hackensack</u> should apply.

In response to the judge's statement that defendant was a quasi-public entity, defendant argues at length distinguishing the holding in Matthews where the Supreme Court found that defendant was a quasi-public entity because of its dedication to the public good. But the analysis in Matthews would only be relevant if the judge had applied the doctrine of substitute facilities espoused in Hackensack. As noted, the judge declined to do so.

In any case, we do not agree that the judge intended to create a hybrid of the valuations described in Weiswasser and Hackensack. As noted, the judge's charge closely tracked the model jury charge for severance damages, as discussed in Weiswasser, and was not capable of producing an unjust result. Instead, the judge correctly instructed the jury that in a partial taking, a defendant must mitigate damages, and part of that cost to cure analysis is whether the substitute property offered by plaintiff is similar and adequate to the land that was condemned.

IV.

Defendant argues that the evidence in the record did not support the jury's verdict. We disagree.

The judge may have created some confusion during oral argument on the motion for JNOV when he expressed concern that Brodowski did not provide a

24

value for the property encumbered by the SDRE. Nevertheless, the judge ultimately correctly determined the verdict was supported by adequate evidence in the record.

"A jury verdict shall not be reversed as against the weight of the evidence 'unless it clearly appears that there was a miscarriage of justice under the law.'" Kassick v. Milwaukee Elec. Tool Corp., 120 N.J. 130, 134-135 (1990) (quoting R. 2:10-1). "[W]hat the trial judge must do is canvass the record, not to balance the persuasiveness of the evidence on one side as against the other, but to determine whether reasonable minds might accept the evidence as adequate to support the jury verdict[.]" Velop, Inc. v. Kaplan, 301 N.J. Super. 32, 48 (App. Div. 1997) (citing Kulbacki v. Sobchinsky, 38 N.J. 435, 444-45 (1962)).

A trial judge's denial of a motion for JNOV shall not be reversed unless it "clearly appears that there was a miscarriage of justice under the law." R. 2:10-1. Our review focuses on whether the evidence submitted to the jury, and any legitimate inferences which can be drawn from that evidence, support the jury verdict. Dolson v. Anastasia, 55 N.J. 2, 5-6 (1969). A jury's factual determinations will be disturbed only if this court finds that the jury could not have reasonably used the evidence to reach its verdict. Sons of Thunder v. Borden, Inc., 148 N.J. 396, 416 (1997).

This standard also applies to expert testimony. In re Accutane Litig., 234 N.J. 340, 392 (2018). We accept the factual findings of the trial judge unless they are shown to be clearly erroneous. Allstate Ins. Co. v. Northfield Med. Ctr., P.C., 228 N.J. 596, 619 (2017).

An expert opinion may be based upon "facts or data" so long as they are of the type reasonably relied upon by experts in that field. N.J.R.E. 703. Experts may not state bare conclusions, unsupported by factual evidence, which are inadmissible as a "net opinion." Davis v. Brickman Landscaping, Ltd., 219 N.J. 395, 410 (2014).

The net opinion rule requires an expert witness to give the why and wherefore of his or her expert opinion, not just a mere conclusion. Davis, 219 N.J. at 410 (citing Pomerantz Paper Corp. v. New Cmty. Corp., 207 N.J. 344, 372 (2011)). The failure of an expert to give weight to a factor thought important by an adverse party does not reduce his or her testimony to an inadmissible net opinion, if he or she otherwise offers sufficient reasons which logically support the opinion. Rosenberg v. Tavorath, 352 N.J. Super. 385, 401-02 (App. Div. 2002).

For expert testimony to be admissible,

> (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2)

A-2413-19

the field testified to must be at a state of the art that such an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony.

[DeHanes v. Rothman, 158 N.J. 90, 100 (1999).]

Expert opinions must "be grounded in 'facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily admissible in evidence but which is the type of data normally relied upon by experts.'" Townsend v. Pierre, 221 N.J. 36, 53 (2015) (quoting Polzo v. Cty. of Essex, 196 N.J. 569, 583 (2008)).

A judge's evidentiary rulings are entitled to substantial deference. Est. of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 383-85 (2010). The judge's determination to admit evidence will not be reversed absent a finding of abuse of discretion. Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016). The valuation of real estate generally requires expert testimony. See Torres v. Schripps, 342 N.J. Super. 419, 430 (App. Div. 2001).

Defendant argues plaintiff did not present facts as to the value of the remainder after the taking, or as to the effect the proposed property interests offered by DEP would have on the value of defendant's remaining properties. Defendant also claims Brodowski offered a net opinion because she did not

27

analyze the value of the new beach land created as a result of the project, the value of the revocable license offered by the State, or the value of the riparian easement plaintiff offered. Notably, defendant did not object at trial to Brodowski's opinion and did not expressly raise this argument below. However, at oral argument on the motion for a new trial, defense counsel referred twice to Brodowski's opinion as "net." The judge made no ruling in this regard. On appeal, defendant states that its motion for a new trial was primarily based on its argument that Brodowski's opinion was net. This was not, however, clear from the record.

Issues not raised below will not be considered on appeal. Zaman v. Felton, 219 N.J. 199, 226-27 (2014). In any case, we conclude that Brodowski did not give a net opinion.

Brodowski testified it was difficult to find comparable properties to facilitate her appraisal. This is because most properties sold in the market place were not beachfront parcels used as public beaches. Despite the scant market information available to her, Brodowski gave her reasoning as to the appropriate valuation of defendant's property before the taking and why the property interest was enhanced as a result of the larger beach and increased shore protection. She gave a value for the remainder property, inasmuch as she stated that the entire

property was devalued by fifty percent, but the net value was increased by five percent because of the benefits of the project. Brodowski clearly explained the "why and wherefore" as to how she arrived at her analysis that there was a five percent enhancement to the property as a result of the construction of the dune. Given the constraints and scarcity of market comparables, her opinion was grounded in facts and data of the type normally relied upon by experts, and also derived from her personal observations. <u>Townsend</u>, 221 N.J. at 53. Thus, Brodowski did not render a net opinion.

Next, defendant argues that because there was no evidence presented, the jury was forced to speculate, which is evidenced by the jury verdict sheet. For example, in question four, the jury valued the property after the placement of the easement at $2,311,700. But according to defendant, there was no basis in the record for this determination, given that Brodowski valued the property before the taking at $2,311,700, and after the taking at $2.4 million. Defendant argues that a simple calculation establishes that in Brodowski's opinion, the property lost forty-five percent of its value, or approximately $1,040,265, without taking into consideration mitigation. But the jury verdict sheet did not reflect the calculations of either expert. Defendant notes that even the judge

acknowledged at oral argument that there was no testimony as to the value of the proposed substitute property.

But "the factfinder may accept some of the expert's testimony and reject the rest." Torres, 342 N.J. Super. at 430. Also, "a factfinder is not bound to accept the testimony of an expert witness, even if it is unrebutted by any other evidence." Id. at 431.

Brodowski provided sufficient evidence to determine the difference in value between the property before and after the taking notwithstanding the judge's statements at oral argument. The jury verdict sheet did not indicate the jury was confused. Instead, it showed that the jury found that the mitigation of damages—the substitute lands given by plaintiff combined with the riparian easement and tidelands license—mitigated defendant's damages. The jury found that the value before and after the taking was the same. The jury was not required to accept all of the experts' calculations. Instead, it was permitted to accept some of Brodowski's opinion and reject other aspects of it, which it did.

Defendant argues the jury verdict was not based upon any facts in evidence and the judge's decision was devoid of any recitation of facts or testimony to support the jury's verdict. In his oral decision, the judge referenced his prior written decision that contained a recitation of facts. The judge made

30

findings that: the parcels consisted of vacant beach parcels; defendant was a non-profit organization providing beach access; the commissioners made a valuation; defendant lost vacant beach land; plaintiff created new beach land adjacent to what was condemned; plaintiff deposited hundreds of thousands of tons of sand to create the new beach; and defendant's expert established the value of the remainder to be $350,000. The judge also noted Graziano's statement of "you take my house and I'll live in yours." The judge correctly concluded there were adequate factual grounds for the jury's decision.

In sum, Brodowski did not render an inadmissible net opinion, and there exists sufficient evidence in the record to support the jury's verdict.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION